UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | No. 3:02 cr 341 (EBB) |
| vs. | : | |
| **SHORELINE MOTORS, ET AL.** | : | February 16, 2007 |

**DEFENDANTS ANGEL HERNANDEZ AND DAVID BROWN'S REPLY TO GOVERNMENT'S MEMORANDUM ON "LOSS" AND RESTITUTION**

Angel Hernandez and David Brown through counsel, submit the following discussion in response to the government's February 7th memorandum on the issues of loss and restitution. It is the defendants' position that the government's brief confirms that the record is not sufficient for the Court to make a reasonable determination of the financial loss realized by the "victim" which was caused by the offense conduct for purposes of § 2B1.1 of the guidelines, and that the best course with regard to an order of restitution under 18 U.S.C § 3663A, it is respectfully submitted, is to invoke the exception to the requirement for a restitution order whenever complex and burdensome issues exist regarding the proof of "the cause and the amount of victim's losses" such that the need to impose a restitution order is outweighed by the need to impose a sentence. The matter should, it is submitted, be left to the civil claim and litigation process between the victim and the defendants.

-1-

**Financial "loss" for Purposes of §2B1.1 of the Sentencing Guidelines**

The lack of validity of the government's position on the "loss" issue is apparent from its brief to the Court, as follows.

The first method urged upon the Court by the government for calculating loss is based entirely upon an analysis which the Court has been asked to adopt because, we are told, it was prepared by the "credit risk" staff at MMCA for purposes of this litigation. The loss figure brought to the September 19th hearing was the same as that referred to in the Wiggin and Dana letter which had earlier reported the conclusion that its client, MMCA, had realized $6.5 million more in losses on the Shoreline portfolio of car loans than it had expected to experience. It was the Wiggin and Dana letter that was the sole basis for the loss figure in the first disclosure of the PSR for the guideline offense level computation under § 2B1.1. The defendants objected to the PSR's adoption of this loss figure. There was no explanation of its derivation. The defendants were never afforded the means to explore the methods, assumptions, data, or even the other dealer loan portfolio(s) to which the Shoreline portfolio's loan performance had apparently been compared. It was this specific issue that was supposed to be addressed at the preliminary sentencing hearing conducted by the Court on September 19th. But, as is succinctly pointed out in the government's February 7th brief, the deficiencies which triggered the hearing were perpetuated, not cured, by the testimony presented by the government. Thus, the government's brief claims:

> Here the MMCA credit risk desk under took [sic] the extrapolation and Ms. Cutillo provided [the] testimony . . . . This evidence is the most accurate estimate of the harm caused.

[Gov. Brief p. 9]. The witness referred-to (Ms. Cutillo) did "provide testimony," but her testimony (as is noted in the defendants' February 2nd memorandum) added nothing to the cryptic description of the method apparently employed by unspecified persons at MMCA to arrive at the bare figure for loss in the Wiggin and Dana letter. The defendants' objections to the PSR's use of the Wiggin and Dana letter were never addressed by the government's presentation at the hearing. The objections were meant to cause some explanations to be presented regarding the calculus of the proposed loss figure, the data used, the foundations and validity of the purported comparison of portfolios implicit in the Wiggin and Dana letter's conclusion, etc., however, the testimony at the hearing was to the effect that Ms. Cutillo really did not participate in the preparation of the computation, [TR 35]; that she did not know how the analysis was performed [TR 39]; that she had never done any such analysis in her work at MMCA; nor could she explain how or why the Shoreline portfolio's default incidence exceeded the expected default rates, in fact, she could not inform what any of the normal default percentages were that were used in the analysis or how they were derived, nor did she know which dealerships' portfolios were the reference point(s) for the comparison of loss, etc. Ms. Cutillo was also unable to provide any basis upon which the Court could, as a matter of causation, connect, in a reasoned way, the offense conduct to the proffered differential between the Shoreline portfolio loss and the losses for the un-specified dealerships which were used in the comparison. The best this witness could do was to testify that (as set forth in the government's brief): " . . . *its our feeling that this discrepancy is part of the fraudulent contracts . . . related to fraudulent contracts*." It is respectfully submitted that this is far too thin a reed upon which

to support a proposed finding of fact which, if made, would have the effect of increasing a defendant's prison sentence by as much as ten years under the guidelines.

The second method urged by the government in its Memorandum of February 7, 2007 in regard to loss, claims that the 2.7 million dollars that Mitsubishi paid to car purchasers to settle lawsuits against Mitsubishi should be considered a loss caused by the defendants. This issue was addressed in detail in the Joint Memorandum of Angel Hernandez and David Brown filed in this matter on February 2, 2007, but restated here in response to the February 7, 2007 memorandum. It is the defendant's position that the government has failed to prove that the 2.7 million dollars paid represents settlements of claims whose bases were the offense conduct of the defendants. The government, in its disclosure on the eve of the September 17th hearing, provided 500 affidavits from car purchasers and associated copies of civil complaints which charged CUTPA violations against Mitsubishi. At that time, the government disclosed that those cases had been settled by Mitsubishi by way of monetary payments and forgiveness of indebtedness in an amount totaling $2,744,852.57. The government now asks this Court to find that this is a loss attributable to the offense without connecting the dots between conduct of the defendants and the payments of the settlements.

As pointed out in the defendants' February 2nd memorandum, the testimony at the hearing only established that all of the affidavits utilized the identical language and that upon scrutiny of the affidavits, they actually allege that Mitsubishi failed to adequately advise them of the balloon payment term of the loans. In addition, it became apparent from examining the specific allegations of the complaints against MMCA that those claims

included CUTPA violations against MMCA. It also became apparent at the September 19, 2006 hearing, that, in order for the defendants to defend against a claim of a loss in this amount, they would have to have some indication of the terms of the settlement. It is certainly reasonable to assume that Mitsubishi settled those claims based on the specific allegations against Mitsubishi. This Court is well aware of the consequences of CUTPA violations under Connecticut law as was Mitsubishi's attorneys. It is reasonable to infer that that knowledge and perhaps some intuition that those allegations could have been proven against it precipitated Mitsubishi's decision to settle those claims. At any rate, the issue could have been determined to a much higher degree certainty through disclosure of the settlement agreements. At the hearing, the Court asked counsel for the government to obtain a copy of the settlement agreement and even suggested that it could be examined by the Court in-camera. Mitsubishi's response was that in order to protect future negotiations for pending claims against it by car purchasers, it did not feel it wished to disclose the contents of the settlement agreement. In light of Mitsubishi's refusal to assist the Court, it would be appropriate to refuse to find any loss for this victim.

Additionally, in its Memorandum of February 7, 2007, the government has asked the Court to make a finding of loss based upon an extrapolation derived from the testimony of Greg Stiff during the trial of this matter. In its argument, the government refers to its Exhibit 01-50 which it claims establishes that on the 29 deals for which live testimony was presented at trial, MMCA suffered a total loss of $365,972.00, The government then asks the Court to make a finding, through extrapolation, of an overall loss of approximately 7.2 million dollars on the Shoreline portfolio. However, this method assumes too much - the

government makes reference to trial testimony to support the use of a 30% rate for fraudulent loans at Shoreline. However, three different estimates were elicited from former employees which ranged from 100% to 50% to the 30% (which the government says must be the minimum rate). It is submitted by the defendants however, that these employee-estimates, whichever figure is analyzed, are not reliable, not for purposes of issues which impact upon the defendants' loss of their freedom. The witnesses did not provide any foundation for their estimates. The estimates are extremely different from each other; they have no more probative value than any other purely arbitrary figure which could have been promoted by the government. The computation of loss must be a *reasonable* estimate, and therefore not based upon a random or arbitrary figure.

In support of its argument, the government cites several Second Circuit decisions which have employed the extrapolation method. Those cases, using common logic, reasoned that from the two components of the calculation, namely, the average loss per known fraudulent transaction and the number of fraudulent transactions, one could arrive at a reasonable estimate. But, unlike the decisions cited, the government here has not proven what the number of transactions at Shoreline were fraudulent. The estimates of co-conspirators do not satisfy even the most lax evidentiary standard.

The Government also suggests to the Court that perhaps it could use the "gain" to the defendants as an alternative method of determining the offense level. However, it is the defendants' contention that using the 2.4 million dollar total gain would be inappropriate. There were clear shortcomings in the government's "proof" of the gain realized by the defendants, as are set out in the defendants' initial memorandum of loss;

e.g., the government agent was unable to distinguish between "gain" that was derived from non-fraudulent business activity and that from the defendants' fraudulent activity.

In the government's February 7th brief, the argument is made that the victim's conduct, (e.g., MMCA's balloon payment lending programs, its Daybreak credit non-verification system, etc.) should not be deemed by the Court to be grounds for any downward departure from the offense-level which the "loss" figure yields. However, the defendants submit that the issue of departure from the guidelines (on any grounds) is simply not an issue which should be addressed at this point. Rather, the defendants' focus here is upon the overall pecuniary loss figure. The departure issue is for the Court's subsequent determination of the sentences for each particular defendant.

However, it is important to the determination at issue here to address one of the propositions advanced by the government regarding departure. At page 19 of its February 7th brief, the government comments, without any explanation, that "even assuming *arguendo* that the Court were to afford the testimony of the defendant's expert [David Stivers] any weight" that the testimony "*would not change the loss calculations*."

In the first place, it is not apparent from the testimony of Mr. Stivers at the hearing, on direct or cross-examination, or from the government witnesses' testimony (or from anything else in the record) why the Court would not "afford" Mr. Stivers' contribution to the Court's and the parties' understanding of the issues any "weight". There has been no showing whatsoever that Mr. Stivers was anything but knowledgeable of the specific subjects at issue, informed regarding the testimony, documents and relevant evidence in the case, and that his expertise was acquired from decades of first-hand experience in the

field of automobile financing. His conclusions and opinions were completely reasonable and valid. And this flaw in the government's approach is why the argument advanced by the government at page 20 of it's brief is typical of the "reasoning" it employs throughout. That is, the recitation of conclusory statements such as the "evidence clearly establishes," the "government has established," etc. without any foundation for the conclusion in the record. The government, to head off the departure arguments it anticipated the defendants would make, the government states that the purportedly excessive losses realized by MMCA could not have been the product of MMCA's aggressive balloon-payment lending programs or caused by MMCA's "loose" practices of non-verification of credit applications using the Daybreak system, because, the government's argument goes: "*It makes no sense that MMCA would purposefully seek to lose money by underwriting non-performing loans.*" The defendants' response to this is "exactly". The government's memorandum completely misses a very significant point made by Mr. Stivers' testimony. Mr. Stivers (and Ms. Cutillo) testified that MMCA was a captive subsidiary of Mitsubishi Motors of North America, ("MMNA"). It was MMNA who manufactured, distributed and sold the new Mitsubishis to the new car dealerships such as Shoreline. Dealerships such as Shoreline then sell the new car to their customers. To facilitate the sales, MMCA lends the purchase-money to the customer. In a series of accounting entries, the proceeds of the customer's loan is paid by the customer-borrower to Shoreline, which in turn, pays to MMCA the money Shoreline borrowed to finance the purchase of the car by Shoreline from the manufacturer (the "floor plan"). What is missing from the government's reasoning is, of course, the fact that MMNA sells the newly manufactured cars to dealers such as Shoreline

at a substantial profit.  The factory invoice price is sufficiently in excess of the cost to build the vehicle to MMNA, so that even when a customer defaults on its loan from MMCA, and the amount realized by MMCA from the repossession process is less than the principal amount owed (and no deficiency judgment is pursued and collected by MMCA) the "loss" realized on MMCA's customer loan is more than offset by the profit which MMNA realized from the initial sale of the car to the dealership.  Thus, rather than making "*no sense*", MMCA's practice of underwriting what it knows are highly risky loans, actually makes *good sense* to MMCA because it results in an overall *profit* from the combined transactions of MMNA and its lending arm, MMCA.  This is why Mr. Stiver's testimony does make a difference to the computation.

It is the defendants' hope that this Court was persuaded by the arguments regarding standard of proof set forth in their initial memorandum of February 2nd. It is strongly urged and respectfully submitted that a heightened standard of proof is necessary to afford the defendants a fair determination of this sentencing factor because it will directly impact their liberty. The amount of loss is the "tail that wags the dog" of any fraud sentencing and thus the defendants respectfully request that the Court adopt the "maximalist" view regarding the standard of proof as is set forth in *United States v. Pimental*, 367 F. Supp. 2d 143, 154 (D. Mass. 2005) or, in the alternative, an otherwise heightened standard.

## **Restitution**

The failure of the government's proof to connect the claimed losses to the offense conduct is critical to the restitution issue, also.  Thus, when the government points to the

Wiggin and Dana letter, or to the "mystery" analysis performed by the MMCA staff at the "risk desk", the problem remains that no evidence has been provided to show that the defendants' conduct in submitting fraudulent loan applications for their customers to MMCA are the same defaulted loans which went into the loss computations. It is settled that:

> *Congress intended restitution to be tied to the loss caused by the offense of conviction . . . . Under ordinary concepts of causation, a victim cannot be compensated for moneys which it would have parted with in any event.*

*United States v. Eisen*, CR-90-18, 1991 WL 180403, at *1 (E.D.N.Y. Sept. 3, 1991) (citations omitted). As noted earlier, Mitsubishi was willing to part with the balances due and owing from the customers because it had already reached the point of profit on the transaction and the risky financing was the means to get it to that point.

Although restitution is mandated in cases where a defendant has been convicted of a crime involving fraud or deceit, the statutory scheme exempts from this requirement cases where determining the amount of loss when: *(a) the number of identifiable victims is so large as to make restitution impractical; or (b) determining the complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden to the sentencing process*. 18 U.S.C. §3633(a)(c)(3). It is the defendants' position that the second factor has dominated the post trial proceedings. While the government claims that the number of "identifiable" individual victims in this case is large, it is unable to specify which are entitled to restitution and in what amounts. Moreover, as discussed in each party's initial submissions, determining the amount of loss

to Mitsubishi would require resolution of complex issues of fact related to the cause and the amount of this victims's loss and would necessarily substantially delay and burden the sentencing further.

**Conclusion**

For the reasons set forth above, it is the defendants' position that the government has failed to meet its burden of proving a reasonable estimate of loss for the guidelines and has failed to provide the bases for the Court's fashioning a restitution order.

A procedure was recently suggested by the Second Circuit in *United States v. Crosby*:

> *In one circumstance, however, precise calculation of the applicable Guidelines range may not be necessary. Now that the duty to apply the applicable Guidelines range is not mandatory, situations may arise where either of two Guidelines ranges, whether or not adjacent, is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies. This leeway should be useful to sentencing judges in some cases to avoid the need to resolve all the factual issues necessary to make precise determinations of some complicated matters, for example, determination of monetary loss.*

*United States v. Crosby*, 297 F.3d 103 (2nd Cir. 2005).

The problem with the Government's approach in this case is that it has simply not undertaken the work necessary to provide a factual basis for a reasonable estimate. Given the amount of time that has been used to get the Court and the parties to the present juncture, it appears that the Government will never be able to present to the Court the means to arrive at valid loss and restitution figures.

Respectfully submitted,
ANGEL HERNANDEZ, defendant

*Kurt F. Zimmermann* By LKA
By: Kurt F. Zimmermann, his attorney
Fed. Bar No. ct00581
SILVERSTEIN & OSACH, P.C.
234 Church Street
New Haven, Connecticut 06510
(203) 865-0121, 865-0255 fax
Email: kzimmermann@so-law.com


Respectfully submitted,
DAVID BROWN, defendant

*Robert C. Mirto* By LKA
By: Robert C. Mirto, his attorney
Fed. Bar No. ct00188
MIRTO, KETAINECK, BARRETT & DiCROSTA
P.O. Box 428
West Haven, Connecticut 06516
(203) 932-2225, 934-4834 fax
Email: bob@mkbd.com

## CERTIFICATE OF SERVICE

      This is to certify that a copy of the foregoing Reply has today, February 16, 2007, been mailed to:

Michael McGarry
U.S. Attorney's Office
157 Church Street, 23rd Floor
P.O. Box 1824
New Haven, CT 06510

Jonathan J. Einhorn
412 Orange Street
New Haven, CT 06511

Richard S. Cramer
449 Silas Deane Highway
Wethersfield, CT 06109

Michael Stanton Hillis
Carl Frederick
Dombroski, Knapsack & Hillis
129 Whitney Avenue
New Haven, CT 06510

_____ By LKA
Kurt F. Zimmermann

_____ By LKA
Robert C. Mirto