UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------X
                                       :
UNITED STATES OF AMERICA               :
                                       :
            v.                         :    NO. 3:02CR341 (EBB)
                                       :
ANGEL HERNANDEZ, DAVID BROWN,          :
RICHARD BROWN AND NELSON DATIL         :
                                       :
            Defendants.                :
                                       :
---------------------------------------X

## RULING ON RESTITUTION

Angel Hernandez, David Brown, Richard Brown, and Nelson Datil were found guilty of multiple counts of mail and wire fraud for their parts in a conspiracy to falsify loan applications at Shoreline Motors Mitsubishi dealership. The government seeks restitution of the financial loss resulting from the fraudulent applications directly to Mitsubishi Motors Credit of America. For the following reasons, restitution is DENIED.

## BACKGROUND

Between February, 2000, and September, 2002, some employees of Shoreline Motors Mitsubishi Dealership engaged in a conspiracy to increase their sales by various fraudulent means, including withholding important financing information from purchasers and submitting altered loan applications to Mitsubishi Motors North America's credit company, Mitsubishi Motors Credit of America ("MMCA"). Based on the altered applications, MMCA extended loans to unqualified purchasers, many of whom defaulted on their

payments, causing a loss to MMCA.

Each of the four remaining defendants worked at Shoreline Motors during the period of fraud.[1] They were charged in a twenty-two count Fourth Superceding Indictment, and on September 7, 2005, all four were found guilty of Count One, conspiracy to commit mail and wire fraud under 18 U.S.C. § 371.  Additionally: David Brown was found guilty of six counts of wire fraud under § 1343; Richard Brown was convicted of one count of wire fraud and one of mail fraud under § 1341, and; Nelson Datil was convicted of four counts of wire fraud and one of mail fraud.  Angel Hernandez was convicted of all twenty-two counts.

The court held a separate hearing on September 19, 2006 to determine the amount of loss resulting from the conspiracy for the purposes of restitution and sentencing.  The government called two witnesses to support exhibits showing the preferred method of loss calculation and losses due to litigation.  On February 7, 2007, the Government submitted its Memorandum in Aid of Sentencing ("Sentencing Memorandum"), providing a summary of the government's position.  This ruling deals only with restitution; at issue is whether the government provided the court with an adequately accurate method by which to estimate the loss incurred by MMCA due to the fraud at Shoreline Motors from 2000 to 2002.

---

[1] A number of former employees of Shoreline Motors were charged with fraud, but only these four defendants remain for the purposes of this disposition.

2

DISCUSSION

As its title implies, the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, requires restitution to the victims of certain categories of offenses, including fraud. See 18 U.S.C. §§ 3556, 3663A(c)(1)(A)(ii). MMCA is an "identifiable victim" who has suffered a "pecuniary loss" and should be considered a victim eligible for restitution under the statute. See § 3663A(c)(1)(B). The amount of restitution should be the value of the property on the date of the damage, loss or destruction. §3663A(b)(1)(B)(i)(I). The requirement to order restitution is not absolute. The court "shall not" order restitution to victims of fraud if:

> determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

§ 3663A(c)(3)(B).

The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense is on the attorney for the government. § 3664(e). There is no constitutional requirement that the facts used by the court to calculate restitution be first found by a jury beyond a reasonable doubt. United States v. Dupes, 513 F.3d 338, 345-46 (2d Cir. 2008)(citing United States v. Reifler, 446 F.3d 65, 116 (2d Cir. 2006)), cert. denied, 128 S.Ct. 1686 (U.S. Mar. 17, 2008). In Reifler, the Second Circuit squared the

3

reality that restitution calculations often rely on information that comes to light after a jury trial with the Sixth Amendment proof requirements laid out in United States v. Booker.[2]  Reifler recognized that prosecutors often do not yet have all the facts available at trial to accurately determine loss, and even when the prosecution does have them, presenting all the facts to a jury at trial could result in an unnecessarily complex and confusing process.  446 F.3d at 117.

But mere speculation is impermissible.  The government's burden for showing loss for the purposes of restitution under § 3663A is closest to the preponderance of the evidence standard. Reifler, 446 F.3d at 119 (citing United States v. Miller, 419 F.3d 791, 792-93 (8th Cir.  2005)("the preponderance-of-evidence burden in [MVRA] restitution cases is unchanged by the United States Supreme Court's recent decision in United States v. Booker"), cert. denied 126 S.Ct. 1379 (U.S. Feb. 21, 2006).  The court must order restitution if it is more likely than not that the loss estimate is accurate, but need not order restitution where the calculation of loss is so complex or opaque that it would inordinately delay the process or is likely to be grossly inaccurate. In other words, if the government does not provide a transparent method for fixing or

---

[2] See United States v. Booker, 543 U.S. 220, 232-33 (2005) (holding that any fact other than a prior conviction used to support a sentence above the prescribed guideline range must be either admitted by the defendant or proven to a jury beyond a reasonable doubt).

4

reasonably estimating the victim's loss resulting from fraud, the court is not required to order restitution.[3]

The $6.5 Million Loss Estimate

The government urges the court to accept a $6.5 million loss figure provided by MMCA.[4] MMCA came to this number by calculating the difference between the expected net credit loss and actual (projected) net credit loss at Shoreline Motors during the period of the conspiracy. Government's Memorandum in Aid of Sentencing ("Memo.") at 2-4. That is, according to MMCA, it lost $6.5 million more on loans extended to purchasers at Shoreline Motors during the conspiracy than it expected. At the sentencing hearing, the government submitted a single-page spreadsheet labeled "Shoreline Loss Comparison: Original Net Credit Loss vs. Actual

---

[3] In its Memorandum in Aid of Sentencing, the government cites a number of cases for the proposition that the estimation of loss does not require that the sentencing court calculate loss with certainty or precision. See, e.g., United States v. Granik, 386 F.3d 404, 414 n.7 (2d Cir. 2004)(citing United States v. Bryant, 128 F.3d 74, 75 (2d Cir. 1997)(per curiam)). The cases cited by the government all relate to an estimation of loss for purposes of sentencing, not restitution. The principals of calculation are related, but they are not identical. See generally, Reifler, 446 F.3d 65. In sentencing, the court's interest is fixing an appropriate punishment for the crime. But to order restitution, the court must be able to accurately gauge each victim's loss while avoiding overpayment.

[4] MMCA calculated a total projected loss of just over $8 million dollars due to the fraud. The $6.5 million figure represents estimated loss as of September, 2006, at the time of the sentencing hearing. Memo. 2.

5

(Projected) Net Credit Loss as of 6/6/6," marked as Government's Exhibit AB ("Loss Comparison") and called one witness, Diane Cutillo, director of operations for MMCA in support of the $6.5 million loss estimate.

Ms. Cutillo was unable to lay an adequate foundation for the Loss Comparison.  She had not been involved in the creation of the worksheet and was not exactly certain who had created the sheet or conducted the loss calculation. Hearing Tr. 34, 35, 121, Sept. 19, 2007.[5]  She had reviewed the document in preparation for the hearing with both the credit risk and legal departments, Tr. 34, but on voir dire she was unable to provide pertinent details about the exhibit.  Crucially, she could not adequately explain the formula for expected and projected loss. Tr. 34, 120-21.  Nor was she familiar with particulars such as the reason why certain rows were labeled "N/A."  Tr. 124.

Ms. Cutillo was also unable to respond competently when defense counsel raised questions about the assumptions underlying the Loss Comparison calculations and the effect of certain MMCA lending practices on projected loss. First, the spreadsheet was apparently based on national historical data and not on lending data specific to the northeast where Shoreline Motors was located.

---

[5] When asked who had created the exhibit, Ms. Cutillo responded, "This data was primarily prepared by the credit risk department, probably one to two people in that department." Tr. 34.

Tr. 142. Second, during the period covered by the Loss Comparison, MMCA financed balloon payment plans under special, higher-risk programs called the Diamond Advantage Plan and the Diamond Option Plan. Tr. 88-89. Although defense counsel questioned Ms. Cutillo on these programs, the government adduced no testimony from Ms. Cutillo or anyone else to explain how long the plans had been in place prior to the fraud period and how these higher-risk plans could have affected expected loss calculations against historical data during the fraud period. Tr. 88-89, 101-04.  Third, loan applications at Shoreline and other Mitsubishi dealerships during the period at issue were processed by the computerized Daybreak system, which analyzed loan applications in under 30 seconds. Tr. 93. MMCA did not itself verify any of the information submitted by the dealerships. Tr. 107-09. Ms. Cutillo admitted that she was not familiar with the Daybreak system and did not know if or how it verified employment information.   Tr. 93-94, 106-07.  The government adduced no testimony about how long Daybreak was in use prior to the fraud period and how the system may have affected expected loss calculations.

### $2.7 million in Lost Principal

As an alternative to the $6.5 million figure, the government asserts that MMCA suffered a loss of $2.7 million in principal in a settlement arising from the fraud at Shoreline Motors. Memo. 5.

At the sentencing hearing, the government submitted a spreadsheet labeled "Mitsubishi Principal Lost," marked as Government's Exhibit AA ("Government's AA"), that lists a "loss amount" attributable to each of the 247 plaintiffs.

The government also failed to establish a foundation for this exhibit. The spreadsheet was prepared by outside counsel, not Ms. Cutillo. Tr. 97-98. Ms. Cutillo was not involved with the litigation, Tr. 112-13, and did not review the settlement agreement at any time prior to the September 19 hearing. Tr. 117. Nor had she verified that the claims listed on Government's AA all arose from Shoreline Motors. Tr. 97. Critically, she did not know how the lost principal was calculated. Tr. 68, 97-99. Specifically, she did not know whether interest was included on the chart, Tr. 130, or whether MMCA had forgiven the debt on any given purchase. Tr. 143. Additionally, at the sentencing hearing, the government submitted one-page affidavits from individuals listed on Government's AA. But prior to the hearing, Ms. Cutillo had only verified that some of the affidavits matched the names on the spreadsheet, Tr. 51-52, 116, and defense counsel had no opportunity to verify the affidavits against the exhibit prior to the hearing.

Neither Ms. Cutillo's testimony nor the affidavits showed that the $2.7 million settlement reflected actual loss due to fraud at Shoreline Motors. The lawsuits against MMCA included claims under the Connecticut Unfair Trade Practices Act (CUTPA) and the threat

8

of triple damages, Tr. 76-78, so MMCA may well have yielded to a batch settlement in order to avoid trial. The court has no way of knowing. The settlement agreement itself is confidential and was not presented to the court. Tr. 69-71. Defendants were not a party to the settlement, and the government produced no witness who could testify as to what percentage of the settled suits were based on valid fraud claims.

Alternate Loss Calculations

In its sentencing memorandum, the government suggests two additional methods for calculating loss. Each is flawed. First, the memo states that trial evidence established a loss of $365,972 on 29 deals and urges the court to extrapolate that number based on a conservative estimate that 30% of the loans at Shoreline were fraudulent. Memo. 6. This would mean a total loss of $7.2 million. Memo. 6-7. This number is, at best, a guess. The government itself points out that witnesses gave dramatically different estimates of the percentage of deals that included fraud, from 30% to 100%. Memo. 7. The government provided no explanation of when the 29 deals occurred or which defendants were part of the conspiracy when the fraud took place. Second, the government suggests that, as a proxy for an estimate of loss, the court could consider a $2.4 million gain to Shoreline Motors due to fraud. Memo. 7. But the government provides no logical or legal reason

why Shoreline Motors' gain is relevant to the issue of restitution to MMCA.

There are other outstanding issues that factor into MMCA's loss, but were not addressed adequately at the hearing or in the sentencing memorandum. The government did not provide any evidence or testimony about estimates of fraud from sales of used vehicles or leasing contracts. Nor did the government present any evidence about mitigating actions MMCA did or did not take that may have affected the expected loss analysis. For example, Ms. Cutillo testified that MMCA has partnered with Merrill Lynch since 2005 to securitize loans, including possibly loans from 2000 to 2002, but she could not provide any amplifying information. Tr. 90.

## CONCLUSION

The government failed to produce a witness competent to testify about the accuracy of MMCA's calculations and did not establish a transparent method for determining loss. Not a person present at the sentencing hearing had the expertise or wherewithal to dispute whether MMCA's calculations were off by 5% or 5000%. Determining MMCA's loss would therefore prolong and burden the sentencing process. MMCA may instead seek to recuperate its losses through civil remedies.

For the foregoing reasons, an order of restitution is DENIED.

SO ORDERED.

/s/ Ellen Bree Burns, SUSDJ

ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this 14th day of January, 2009.